**Dated: March 31, 2008**

**The following is ORDERED:**



_Tom R Cornish_
_____
Tom R. Cornish
UNITED STATES BANKRUPTCY JUDGE

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| IN RE: | ) | |
| **JAMES CLINTON GARLAND** | ) | Case No. 05-73573 |
| | ) | Chapter 7 |
| Debtor, | ) | |
| | ) | |
| **JAMES CLINTON GARLAND** | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 05-8125 |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| **DEPARTMENT OF THE TREASURY,** | ) | |
| **INTERNAL REVENUE SERVICE**, | ) | |
| | ) | |
| Defendant, | ) | |
| and | ) | |
| | ) | |
| **RICHARD A. WIELAND,** | ) | |
| **United States Trustee** | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 06-8044 |
| | ) | Administratively consolidated |

Case 06-08044    Doc 234    Filed 03/31/08    Entered 03/31/08 15:38:31    Desc Main
Document    Page 1 of 34
EOD 3/31/08 by sev

**JAMES CLINTON GARLAND**      )      under **Adv. No. 06-8044**

                                     )

                 Defendant.    )

## OPINION

This matter comes on for trial before the Court on basically two lawsuits. The first involves an action by the United States Trustee under 11 U.S.C. §727(a)(2), (a)(4)(a) and (a)(5). The principal allegations involve transferring or concealing property by the Debtor within one year before or after filing a bankruptcy; making a false oath or account; and failure by the Debtor to satisfactorily explain the loss or deficiency of assets.

The Debtor, James Clinton Garland ("Garland") has also filed suit against the Internal Revenue Service asking that a judgment be entered under 11 U.S.C. §523(a)(1) and seeking a determination that his personal federal income tax liabilities, including penalty and interest, for the taxable years 1992, 1993, 1995, 1998, 1999, and 2000 be discharged in his Chapter 7 bankruptcy.

Garland further requests that the Internal Revenue Service be permanently barred and enjoined from attempting to collect these taxes. At the time of trial, the total amount of income tax, penalty and interest owed by Garland to the Internal Revenue Service was approximately one million dollars. The trial was governed by the Pre-Trial Order entered by this Court on January 8, 2008. The Court has jurisdiction over these two consolidated adversary proceedings pursuant to 28 U.S.C. §1334(a) and 28 U.S.C. §157. This matter is a core proceeding under 28 U.S.C. §157(b)(2)(A), (I), (J), and (O). This Court has venue of this proceeding.

Garland appears in this proceeding by his attorney, Ron Wright, of Wright, Stout,

Case 06-08044    Doc 234    Filed 03/31/08    Entered 03/31/08 15:38:31    Desc Main
Document    Page 2 of 34

Fite & Wilburn.  The United States Trustee appears by David W. Newman and Paul R. Thomas.  The United States of America appears by U.S. Department of Justice Attorneys Mary E. Bielefeld and Olivia Hussey.  The trial of this matter was conducted by the Court encompassing two full days of testimony on January 9 and 10, 2008.

**FINDINGS OF FACT**

The United States Trustee, the Internal Revenue Service, and Garland have agreed to the following stipulated facts, which the Court includes as part of its Findings of Fact. These stipulated facts are as follows:

**A.**  **Stipulated Facts**

**1.**  **The Taxes**

a.  James Clinton Garland's federal income tax returns for the tax years 1992, 1993, 1995, 1998, 1999 and 2000 were filed more than two years before the date James Clinton Garland filed his bankruptcy petition and the taxes for these years were assessed more than 240 days prior to that date.

b.  The United States properly filed pre-petition Notices of Federal Tax Lien in connection with Garland's 1992, 1993, 1995, 1998, 1999 and 2000 federal income taxes, which attach to all existing property and property rights, including exempt property, belonging to Garland or Jagar Family Limited Partnership, as the nominee of Garland, on and prior to the filing of his bankruptcy petition.

**2.**  **The Bankruptcy**

a.  The United States Trustee timely filed the underlying complaint to deny discharge.  Garland's bankruptcy discharge has not yet been entered.

-3-

b.  On August 25, 2005, Garland, an individual, filed a voluntary petition under Chapter 7 of the Bankruptcy Code along with the associated schedules, statement of financial affairs. Garland signed the Declaration Concerning Debtor's Schedules and the Statement of Financial Affairs under penalty of perjury in the petition.  A true and accurate copy of these documents is listed in an exhibit list which has been filed.

c.  At all relevant times, Gerald R. Miller has served as the Chapter 7 trustee in Garland's bankruptcy.

d.  At the first meeting of creditors on September 20, 2005, Garland testified under oath that he had read his petition, schedules and statement of financial affairs before he signed them, he was personally familiar with information contained in them, to the best of his knowledge the information contained in them was true and correct and that all of his assets and liabilities had been disclosed.

e.  Garland has not filed any amendments to his petition, schedules, or statement of financial affairs.

f.  Based on Garland's schedules, statement of financial affairs and testimony at the first meeting of creditors, the Chapter 7 Trustee filed a report indicating that this was a no-asset case, e.g. there were no assets to be liquidated in this case and there would be no distribution to creditors.

g.  Garland, an attorney, marked "none" in response to question 18 of his statement of financial affairs which requires individual debtors to list the names, addresses, nature of businesses and beginning and ending dates of all businesses in which Garland was an officer, director, partner or managing executive of a corporation, partnership, sole proprietorship or was a self-employed professional within the six years immediately

-4-

previous to the filing of his bankruptcy, or in which he owned 5 percent or more of the voting or equity shares within that same period of time. In 1997 Garland was one of the three founding partners of Commercial Litigation Group, a partnership of professional corporations practicing law. About one year after its formation, Mike Freeman left the partnership and was replaced by Garland's son, William Joseph Garland. Garland claims to have resigned from Commercial Litigation Group in January, 2002. Garland continued to have check signing authority for Commercial Litigation Group even after he resigned to the present time.

h. Since at least 1981 to the present, Garland has continually resided at his principal residence located near Tahlequah, OK ("Residence"). From approximately 1980 or 1981 until 2001, Garland lived with Charla Geri (a/k/a Jere) Blackwell at the Residence consisting of about 90 acres of land and including a house. Garland formed Jagar Family Limited Partnership ("Jagar") on November 26, 1993. Garland, Jere Blackwell, James Garland III, Doug Garland, and William Garland, were limited partners of Jagar. Southwest Industrial Enterprises, Inc. or Southwest Industrial and Investment Enterprises, Inc., or similarly named entity, ("Southwest"), of which Garland was President, served as the general partner of Jagar. The Residence was Jagar's principal asset. In or around January, 1994, Garland, the sole owner of the Residence, transferred it to Jagar. The purported consideration for the transfer of the Residence from Garland to Jagar was Garland's limited partnership interest in Jagar. Garland did not pay rent to Jagar. On March 9, 1995, the Internal Revenue Service ("IRS"), filed a Notice of Federal Tax Lien against Garland in Cherokee County, Oklahoma, for unpaid income taxes for 1992 and 1993 totaling $255,515.50. On October 14, 1999, the IRS filed a notice of federal tax lien against Jagar

-5-

as the nominee of Garland.  On November 8, 1999, Garland filed a request for a Collection Due Process hearing with the IRS contending that the IRS's filing of the nominee lien was an abuse of discretion.  On September 28, 2000, the IRS issued a Notice of Determination to Garland determining that the filing of the nominee lien against Jagar was appropriate. On October 31, 2000, Garland filed a Collection Due Process Case in the United States' Tax Court contending the IRS abused its discretion in sustaining the IRS's collection action, i.e., the filing of a Notice of Federal Tax Lien against the Jagar Family Limited Partnership.

In or around December, 2000, Garland and his son William Joseph Garland incorporated A-Don Corporation ("A-Don").  Initially, Patrick Walters and William Joseph Garland were A-Don's officers.  A-Don obtained a mortgage secured against the Residence from Radiology Profit Sharing Plan.  The foreclosure judgment states that the mortgage was senior to the IRS's tax lien.  A-Don also paid off a prior mortgage to Bank of America. On June 1, 2001, A-Don filed a petition in state court to foreclose on a 1988 promissory note and mortgage in favor of Profit Sharing Plan and Trust of Radiology, Inc., Patrick Walters, Trustee.  The United States denied the allegations in the petition except to admit that it had an interest in the real estate by virtue of its federal tax liens against Garland and Jagar, the priority of which it asked to be determined under §§6321-6323, 26 U.S.C.  The Journal Entry of Judgment entered on October 3, 2001, decreed the tax liens were inferior to the mortgage and indebtedness of A-Don.

A judgment of foreclosure was approved by the US Attorney for the IRS and entered.  On January 16, 2002, the parties in the Tax Court case, filed a joint motion to dismiss the Tax Court case as moot based on the October 3, 2001, Journal Entry of Judgment.  A-Don then acquired the Residence, less about 20 acres, for $270,000, by

-6-

credit bidding at the December 26, 2001, foreclosure sale. The corresponding sheriff's deed was dated in February, 2002.

In a document dated in March, 2002, Walters transferred all of the shares of stock in A-Don to Dr. Clark Bundren for $100.00. In or around September, 2002, A-Don leased the Residence to Commercial Litigation Group for a period of three years. A-Don also executed an assignable option for Commercial Litigation Group to purchase the Residence for $175,000, with certain conditions. In 2002, an appraisal valued the Residence at over $300,000. The consideration for the assignable option was $10.00. The legal description of the Residence in the first foreclosure suit left out about 20 acres, as referenced above. On September 10, 2002, John Bundren, President of A-Don, filed a second petition for foreclosure in state court. The second foreclosure action was removed by the IRS to the United States District Court for the Eastern District of Oklahoma. The United States asserted that plaintiff was not entitled to relief because A-Don, and its purported assignors were not bona fide creditors of Garland. The United States also alleged the transactions were shams in that A-Don was an instrumentality of Garland, being used to avoid his federal tax liability. At a settlement conference held in the removed action, the United States accepted an $8,000 settlement from A-Don. A journal entry of judgment approved by the attorney for the United States was entered in January, 2004. The action was remanded to state court. A-Don successfully acquired title to the remaining approximately 20 acres by credit bidding at the sheriff's sale. The IRS received, but never exercised, a right of redemption in both foreclosure cases.

In or around January, 2005, Garland's son, Douglas Garland, exercised the assignable option and purchased the Residence from A-Don financed by a mortgage loan

-7-

from JP Morgan Chase. Commercial Litigation Group provided the funds to Douglas Garland for closing costs and down payment on the Chase mortgage loan. Commercial Litigation Group, and other entities for which Garland has check signing authority, have provided Douglas Garland with at least some funds to pay the mortgage payments or have paid at least some of the mortgage payments for the Residence. After Douglas Garland purchased the Residence, Garland has never paid cash rent for the Residence.

i. Garland claims that he does not own, and therefore, did not disclose that he holds or controls the Residence in question 14 of his statement of financial affairs. He did not disclose any interest in the Residence in his schedule A or schedule B.

j. In October of 1993, Garland filed his 1992 federal income tax return reflecting tax due in the amount of $54,903. Garland did not remit payment with the 1992 return. In October of 1994, Garland filed his 1993 federal income tax return reflecting tax due of $193,827. As with the 1992 income tax return, Garland did not remit payment with the 1993 return. Garland filed his 1995 federal income tax return late in February of 1997.

**B.**     **Additional Findings of Fact**

      **1.**     **Background**

James Clinton Garland is one of the most interesting and complex persons to come before this Court during this Judge's fourteen years of service to this Court. Garland is a 70 year old attorney, appears to be in relatively good health, and is a distinguished looking gentleman. In fact, he is a person that looks like a very successful lawyer. He is well educated, articulate, and has an extensive knowledge of business, through his involvement in various business enterprises. According to his testimony, Garland has formed over 600

-8-

corporations for clients as well as for himself and his family over the course of his legal career. He also has expertise in class action lawsuits, some involving Goodyear, Firestone and other large corporate entities.

Garland testified that his income over the years has been quite volatile, subject to ups and downs as is the nature of class action work. He stated that, in many years, he would get behind on his income taxes but would anticipate a spike or upturn the following year in order to generate enough income to pay for deficiencies owed for the previous year. According to Garland, it was his inability to sustain good years of income that lead to his insurmountable tax bill. Apparently, his decision not to change his class action practice to another area of the law has contributed to many lean years in his profession. He also testified that his class action business dried up when the IRS filed a pre-judgment garnishment in a class action case in which the attorney fees should have been $30,000,000. Instead, the IRS' interference in the case caused the judge to reduce the attorney fees to $1,000,000. Thereafter, other class action attorneys refused to do business with him. He also lost business when he had to resign from a large class action case to deal with personal matters involving his minor children in 2002. Garland's stated purpose in filing bankruptcy was to get back into the class action business by clearing up his tax debt.

He has been married more than one time and has eight children. Three of his oldest sons are attorneys and members of the Oklahoma Bar Association. One of the sons does not practice law but works for EDS. Garland has been in practice in Tulsa with two of his sons, James Garland II ("Jim") and William Garland ("Bill"), in Commercial Litigation Group. Although he  resigned as a partner from Commercial Litigation Group in 2002, he has

Case 06-08044    Doc 234    Filed 03/31/08    Entered 03/31/08 15:38:31    Desc Main
Document    Page 9 of 34

remained with the firm in an "of counsel" position. He resigned as a partner in order to devote all of his time to finding his children, who had been taken away from him by their mother. As noted in the Stipulations, Garland continued to have check-signing authority for that firm even after he resigned as a partner.

Most of the trial was spent on the Trustee and IRS establishing that Garland had interests in numerous entities and access to many bank accounts by having signatory authority on those accounts. The Court also received extensive evidence establishing that Garland failed to disclose in his bankruptcy filings these interests that existed six years prior to the bankruptcy, and that he continued to have the ability to generate money and income from various bank accounts during the time that his bankruptcy has been pending.

### 2. Bankruptcy Petition and Schedules

Garland's bankruptcy petition and schedules were "plain vanilla." The principal liability was to the Internal Revenue Service for tax, penalty and interest. His petition also included a few other unsecured debts that were insignificant.

He did not list a legal or equitable interest in the Residence, but did list two automobiles (1982 Mercedes Diesel and 1993 GMC Suburban), which he stated were owned by Commercial Litigation Group. In Garland's Petition, he listed his occupation as a lawyer, and listed monthly income of $1,150 per month from Social Security and $2,000 per month as counsel to Commercial Litigation Group, for a total monthly income of $3,150. In his Schedule J, Current Expenditures, he listed $0.00 as rent or home mortgage payment, and listed no expense for electricity, water or telephone. He listed expenses for food, clothing, laundry, medical and children's school expenses of approximately $1,890.00 per month.

-10-

In Garland's Summary of Schedules, he listed creditors holding unsecured priority claims of $1,157,488.36. This represents taxes owed to the Internal Revenue Service plus penalties and interest for a period of over ten years.

Trustee Gerald Miller testified that Garland's bankruptcy petition, schedules, and statement of financial affairs gave him the impression that Garland was a retired attorney with no assets available to satisfy creditors. The tax liability appeared to be an anomaly. Based upon Miller's fifteen years as a Bankruptcy Trustee, and his reliance on the schedules filed by Garland, Garland's bankruptcy did not appear unusual and gave him no cause to inquire further. He did acknowledge, however, that the U.S. Trustee's office became involved in the case and conducted a 2004 exam of Garland.

###  3.    Tax Returns

In spite of all the problems Garland has had with the Internal Revenue Service, he did not even file his individual tax returns for the calendar years 2001, 2002, 2003, 2004 until he filed for bankruptcy in August, 2005. Garland's explanation for this failure was that he lost his accountant of many years in 2001, and was unable to find an accountant to file the later years' returns because he did not have sufficient funds to hire an accountant. This explanation by Garland did not impress the Court. The IRS provided his recently filed tax returns, showing total income and taxable income as follows:

| Tax Year | Total Income | Taxable Income |
|----------|--------------|----------------|
| 2000 | $ 65,028 | $ 42,786 |
| 2002 | $ 14,942 | $ 0 |
| 2003 | $ 20,785 | $ 2,048 |
| 2004 | $ 21,976 | $ 2,832 |

-11-

| 2005 | $ 30,821 | $ 7,573 |
| 2006 | $ 21,825 | $ 0 |

Garland's tax problems began in the tax period ending December 31, 1992, when he was assessed the sum of $54,903.00 for unpaid taxes. For the tax period ending December 31, 1993, tax was assessed in the amount of $193,827.00, based upon taxable income of $601,762.00. For the tax period ending December 31, 1995, tax was assessed in the amount $5,981.00, based upon taxable income of $9,777.00. For the tax period ending December 31, 1998, tax was assessed in the amount of $5,846.00, based upon taxable income of $15,449.00. For the tax period ending December 31, 1999, tax was assessed in the amount of $24,069.20, based upon taxable income of $54,699.00. For the tax period ending December 31, 2000, taxed was assessed in the amount of $20,675.00, based upon taxable income of $53,236.00.[1]

Garland's tax returns demonstrate a pattern of filing tax returns late and not remitting the taxes due. According to Garland's extensive testimony, his plan was to pay or get current on his delinquent tax in those subsequent years in which he hoped his income would be substantially higher as a result of class action fees. This testimony is not supported by the record because, in the year in which Garland had over $600,000.00 in taxable income, not one penny of this income was used to pay any current or delinquent income tax. In fact, out of the taxes, penalty and interest of over one million dollars ($1,000,000.00) due at the time Garland filed his Petition, very little effort, if any, has been made to pay down this delinquency.

---

[1]The amount of these assessments does not include interest or penalties.

-12-

It is also of interest that at the time Garland filed his Petition in bankruptcy, he had six consecutive years of unfiled federal tax returns.  In fact, it was only due to the filing of his Petition in bankruptcy on August 24, 2005, that Garland filed any tax returns for the previous three years in order to become an eligible filer under Chapter 7 in this District.

### 4.    Garland's Residence

Garland acquired his Residence in 1981, a five (5) bedroom home, plus 90 acres in rural Cherokee County, near Tahlequah, Oklahoma.   He has made substantial improvements on the house, including a new garage, a storage building with room for four (4) automobiles, and a relatively new swimming pool in the front yard.  Stuart Anderson, IRS Revenue Officer, testified that he visited the Residence as part of his investigation of Garland.  He met Garland at the property, who identified himself as having lived there a long time.  Mr. Anderson observed a swimming pool, tennis courts, an attached four-bay garage, a separate garage with approximately seven bays, and a boat on the property.  As noted in the Stipulated Facts, Garland has resided in this Residence  continuously without interruption since 1981.  He presently resides there with his wife and minor children.

Garland's occupancy of this house and the numerous transfers of title to this house took up a substantial portion of this trial, and was the most contentious issue litigated in these proceedings.  It appears to the Court that the house has been transferred so many times as to qualify for platinum status in most frequent flyer programs.  This home has been transferred to different corporations and partnerships, each owned or controlled by Garland or his close business associates or family members.   Most of the transfers were accomplished with the assistance of Garland's former accountant, Patrick Walters.  Garland's friend, Dr. Clark Bundren, was also deeply involved in various transfers of the

-13-

Residence.  Both Dr. Bundren and Mr. Walters were long time business associates of Garland, and of each other.  Patrick Walters testified that Garland was always allowed to reside in the Residence because the various owners did not want the property to be unoccupied.  He described his relationship with Garland as "very integrated."  He admitted that one purpose of the A-Don arrangements was to ensure that Garland would keep his home.

As a result of the IRS' tax lien against the Residence, the IRS was named as a party in the two foreclosure proceedings involving the Residence.  These liens were inferior to A-Don's mortgage and were therefore foreclosed.  Although the IRS could have exercised its right of redemption in both cases, it chose not to do so.  William Castor, attorney for the IRS assigned to Garland's case, explained that the IRS rarely exercises its right of redemption because it involves paying an amount equal to what the purchaser paid for the property at the foreclosure sale.  Redemptions require that a taxpayer have significant equity in the property.  According to Mr. Castor, the IRS was concerned that A-Don was not a bona-fide mortgagee and that the foreclosure action was a sham.  In investigating these foreclosures, he noticed that Garland was the service agent for A-Don, and thought it unusual that A-Don would sue its own service agent.  The IRS did not wish to pay a sham mortgagee, and a redemption would essentially be paying the taxpayer for his own property while the taxpayer still owes taxes.

The most recent transfer of the Residence was to Garland's son, Douglas.  As stipulated, Commercial Litigation Group provided the funds that Douglas used to purchase the Residence.  Douglas testified that his brothers approached him about purchasing the Residence from A-Don, and informed him about his father's tax problems.  Douglas  was

-14-

not looking for an investment opportunity and had not considered investing in real estate, but he reluctantly agreed to purchase the property to help his father. Douglas did not think he had the financial ability to qualify for a mortgage on the Residence but he agreed to purchase it after his brothers agreed that Commercial Litigation Group would make the down payment and help Douglas make the monthly payments. To qualify for a mortgage on the Residence, the mortgage company required that Douglas have access to funds sufficient to make the monthly payments. Therefore, his brothers sent a letter from Commercial Litigation Group to the mortgage company stating that Douglas had access to Commercial Litigation Group funds to pay the mortgage. Unbeknowst to Douglas, his brothers, Jim and Bill, made him a signator on Commercial Litigation Group's checking account by signing his name, and listing his social security number and date of birth on the signature card. This was to prove that Douglas had sufficient funds available to make the mortgage payments. However, it was not until this adversary was filed and Douglas was deposed that he discovered his brothers had made him a signator on the Commercial Litigation Group bank account.

Douglas identified at least five checks issued from Commercial Litigation Group bank accounts to Douglas and signed by the Debtor to cover monthly mortgage payments on the Residence. He testified that if Commercial Litigation Group stopped making the mortgage payments, he would reconsider his ownership of the home. Douglas keeps no personal property in the home, does not have a room there, does not have a key to the home, and knocks on the door before entering. Douglas did testify that he had no agreement with his brothers that he would refrain from asking his father and his family to move out of the home.

Case 06-08044    Doc 234    Filed 03/31/08    Entered 03/31/08 15:38:31    Desc Main
Document      Page 15 of 34

Because of Garland's uninterrupted occupancy and enjoyment of this house, the Court determines that Garland had an interest in this Residence that he failed to disclose in his Petition, particularly Schedule A-real property. The instructions to Schedule A provide:

> Except as directed below, list all real property in which the debtor has any legal, equitable, or future interest, including all property owned as a co-tenant, community property, or in which the debtor has a life estate. Include any property in which the debtor holds rights and powers exercisable for the debtor's own benefit. . . . .

On this page, Garland marked "None," under penalty of perjury. It is apparent to the Court that at the time Garland filed bankruptcy, as well as for years prior to filing as well as after filing, Garland had an equitable or beneficial interest in the Residence as evidenced by his uninterrupted and continued occupancy of this home since 1981.

As previously noted by this Court and as detailed in the Stipulated Facts, Garland's Residence has been transferred numerous times. It appears to this Court that the timing of these transfers was meant to keep Garland one step ahead of the IRS's collection actions against him and planned with the intention of keeping the property out of reach of the IRS.

**5.** **Bank Accounts**

Garland listed just one bank account on his bankruptcy schedules, an account with Armstrong Bank in Muskogee, Oklahoma, having a balance of $500.00. However, the Internal Revenue Service discovered six bank accounts (including the account disclosed in his schedules) in which Garland had an interest or signature privileges. The discovery of the majority of these accounts was the result of subpoenas issued by the IRS, not as a result of Garland voluntarily producing the information. The bank accounts are as follows:

-16-

| NAME OF BANK | ACCOUNT NAME & NUMBER | TIME PERIOD |
|---|---|---|
| Armstrong Bank | Savol Enterprises Acct **...832** | 3/03 to 4/06 |
| Armstrong Bank | Commercial Litigation Group Operations Acct **...043** | 8/02 to 8/06 |
| Armstrong Bank | Commercial Litigation Group Special Escrow Acct **....925** | 8/04 to 8/06 |
| Armstrong Bank | Jagar Family Limited Partnership **Acct ...816** | 2/03 to 6/06 |
| Armstrong Bank | James and William Garland Social Security Acct **...572**[2] | 7/04 to 6/06 |
| Armstrong Bank | Karen Hassler Trust Commercial Litigation Group Trustee Acct **....681**[3] | 3/03 to 6/06 |

Also, during discovery, Garland identified two bank accounts at Armstrong Bank, which were open after his bankruptcy petition was filed: Garland Law Firm Trust account number **......075** and the Garland Law Firm Operating account number **.....032**.

Marion Goyette testified on behalf of the IRS regarding the various signature cards and bank records obtained pursuant to a subpoena issued by the IRS. She reviewed for the Court the information she discovered in these bank records. She summarized these records in supporting spreadsheets wherein she separated checks by certain categories

---

[2]This is the only bank account Garland listed in his bankruptcy schedules.

[3]Garland testified that this was an old account that he thought had been closed years ago. At the time he filed bankruptcy, he did not remember that he had signature authority on this account. This account was for a client who had suffered injuries and required rehabilitation. Garland was given authority to oversee this account and pay bills for this client.

-17-

of expenses. Ms. Goyette identified numerous checks on each of the bank accounts that were signed by Garland, and she sorted these checks based upon the expenses each purported to pay. She testified that most checks on the Armstrong accounts were signed by Garland, so she further identified the checks by determining whether the checks paid for expenses of Garland by reviewing the comment line of the check or the Payee. She identified numerous checks for cash, for fuel charges, for veterinary and feed bills, educational expenses for Garland's minor children, dance studio fees for his daughter, as well as numerous lease and mortgage payments for the Residence. Ms. Goyette stated that these checks indicated payments to Garland from the six Armstrong Bank Accounts, as well a Commercial Litigation Group account at Valley National Bank in 2002 only, totaling as follows:

| | |
|---|---|
| 2002 | $26,990 |
| 2003 | $60,386 |
| 2004 | $61,151 |
| 2005 | $71,587 |
| 2006 | $55,827 |
| 2007 | $34,040 (through July of 2007) |

Grand Total       $309,981

Garland testified that this practice of writing checks on these various bank accounts to pay for personal expenses was common in most small businesses. He also stated that his sons allow him to use these accounts to pay for personal expenses because they love him and want to help him. He explained that all of these payments were properly accounted for and attributed as income to him by his and Commercial Litigation Group's

-18-

accountants, and that he properly reported these payments as income to the IRS and paid taxes upon this income where required. However, the Court notes that the income reported on his tax returns does not match the payments made to him through these bank accounts. Garland did not offer any other explanation to the Court.

His son, Bill Garland, testified that Commercial Litigation Group moved all of its accounts to Armstrong Bank in Tahlequah because a client bounced a check, resulting in the closing of their bank accounts by their Tulsa bank, Valley National. Debtor Garland located the Armstrong Bank because the Garlands wanted a small town bank that could handle all of their business and personal needs. He further testified that his father is allowed to write checks on numerous law firm and business accounts, the only limitation being that the checks cannot be in a large amount. He claimed that the money in these accounts belonged to him and his brother, Jim Garland. Bill also testified that his father did not have possession of the law firm check book, but that Debtor Garland does have "sheets of checks" in his possession for him to be able to go to the grocery store and pay expenses for his children. He explained that he and his brother, Jim, needed their father to have access to the Armstrong accounts so that he could get cash for them. Since they do not have a bank in Tulsa, where they live, they depend on their father to withdraw cash from these bank accounts, then give it to them by traveling to Tulsa or by meeting them at a rest stop halfway between Tahlequah and Tulsa. He acknowledged that Commercial Litigation Group has used the Jagar bank account and has deposited firm monies into the Jagar account.

**6.      Interests in Corporations or Partnerships**

Garland marked "None" in his Statement of Financial Affairs in response to question

Case 06-08044    Doc 234    Filed 03/31/08    Entered 03/31/08 15:38:31    Desc Main
Document      Page 19 of 34

18 regarding "Nature, location and name of business." According to the instructions, Garland was to disclose all interests he had as an officer, director, partner, or managing executive within six years immediately preceding the commencement of the case.

Garland admitted that he was an officer or partner in Jagar, Saval, Southwest, and Commercial Litigation Group at some point during the six years prior to filing bankruptcy. However, he testified that none of these positions was worth anything and that many of the corporations that he created and was an officer in, were never activated. He did not consider that any of these positions would be of value to the bankruptcy trustee. He did disclose some of these positions in his 2004 exam, and stated that he had instructed his attorney to amend his bankruptcy schedules to properly reflect this information, but that the amendments were never made.

## **CONCLUSIONS OF LAW**

The U.S. Trustee seeks a denial of Garland's discharge pursuant to 11 U.S.C. § 727(a)(2), (a)(4)(A), and (a)(5). Trustee's primary argument is that Garland concealed assets and information from the Trustee in his bankruptcy schedules. Garland's response is that he fully informed this Court and his creditors of the all interests he had in any property at the time he filed bankruptcy, fully disclosed all assets he owns, and, that any transfers of property he made to other persons and/or entities were done properly, without any secrecy, and without any intent to hinder, delay, or defraud his creditors. Further, Garland seeks a judgment under 11 U.S.C. § 523(a)(1) determining that his federal income taxes, interest and penalties for the tax years of 1992, 1993, 1995, 1998, 1999, and 2000 are discharged, and that the United States, ex rel Department of Treasury, Internal Revenue Service, is therefore barred from collecting those taxes. The IRS joins the

-20-

Trustee in seeking a denial of Garland's discharge, and, in the alternative, requests that if the Trustee is unsuccessful under § 727, the tax debts should be excepted from discharge pursuant to § 523(a)(1).

## A.    Denial of Discharge under 11 U.S.C. § 727.

A discharge of debts through bankruptcy results in "a completely unencumbered new beginning."  *Grogan v. Garner*, 498 U.S. 279, 286-87, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991).   However, this "fresh start" is limited to the "honest but unfortunate debtor."  *Id.*  The party seeking the denial of a discharge must present substantial evidence in favor of its request.  The burden of proving a ground for objection to discharge is on the party objecting to the discharge.  Fed. R. Bankr. P. 4005.  The party objecting to the discharge must show by a preponderance of the evidence that grounds exist supporting the denial.  *Mathai v. Warren (In re Warren)*, 512  F.3d 1241 (10th Cir. 2008); *First Nat'l Bank of Gordon v. Serafini (In re Serafini)*, 938 F.2d 1156 (10th Cir. 1991).  In the present case, the Court finds that Garland has been less than honest in representations made in his bankruptcy petition and schedules, and his circumstances are largely the result of his own design, rather than some unfortunate event.

### 1.    11 U.S.C. § 727(a)(2): Intent to Hinder, Delay, or Defraud a Creditor

To  deny  a  discharge  under  § 727(a)(2),  this  Court  must  find  that  Garland "transferred, removed, destroyed, mutilated, or concealed" property with the intent to "hinder, delay, or defraud" a creditor or officer of the bankruptcy estate.  This activity must have occurred within one year prior to filing the bankruptcy, or after the date of filing.  The "intent" element of this section must be an actual intent to defraud creditors.  *Warren*, 512

Case 06-08044    Doc 234    Filed 03/31/08    Entered 03/31/08 15:38:31    Desc Main
Document      Page 21 of 34

F.3d at 1249, *citing Marine Midland Bus. Loans, Inc. v. Carey (In re Carey)*, 938 F.2d 1073,

1077 (10th Cir. 1991). However, actual intent may be established through circumstantial

evidence as well as inferences from a debtor's conduct. *Warren,* 512 F.3d at 1249, *citing*

*Farmers Coop. Ass'n of Talmage, Kan. v. Strunk*, 671 F.2d 391, 395 (10th Cir. 1982).

Although a single wrongful act or omission may be sufficient to prove actual intent,

"evidence of a pattern of wrongful behavior presents a stronger case." *Freelife, Internat'l*

*LLC v. Butler (In re Butler)*, 377 B.R. 895, 916 (Bankr. D. Utah 2006) quoting *E. Diversified*

*Distr., Inc. v. Matus (In Re Matus)*, 303 B.R. 660, 672 (Bankr. N.D.Ga. 2004). In other

words, courts should consider a debtor's "whole pattern of conduct." *Matus,* 303 B.R. at

672.

The Trustee argues that Garland's conduct evinces a pattern of behavior designed

to defraud his creditors, particularly the IRS. Garland failed to disclose, and concealed, a

number of interests in corporations, signature authority in undisclosed checking accounts,

and an interest in the Residence at which he has resided since 1981. Curiously, he did

disclose that he had the use of two automobiles, both owned by Commercial Litigation

Group, although he claimed no personal ownership of these vehicles. Both the Trustee and

the IRS believe that Garland has engaged in an elaborate scheme designed to keep the

Residence out of the reach of the IRS, and his creditors. Therefore, the issues for this

Court, are: (1) did Garland have an ownership interest in property; (2) if so, was that

interest transferred or concealed, and (3) did he transfer or conceal with an improper intent.

A beneficial interest in property can be inferred where the debtor exercises control

over property, in spite of the fact that he may not retain legal title to that property. *See*

*Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 682-83 (6th Cir. 2000) (debtor had

-22-

beneficial interest in property titled in parents' names).  As previously stated in the Findings of Fact, this Court finds that Garland has an equitable or beneficial interest in the Residence, as evidenced by his uninterrupted occupancy of the residence since the early 1980's.  Garland lives there without paying rent, taxes, utilities, or any of the other normal expenses of  home ownership.  Although Garland may not have retained legal title to the residential property,  there is no question that he and he alone continued to exercise dominion and control over the property.  *See Gullickson* at 1293.  The current owner of the property, Garland's son Douglas, testified that even though he owned legal title to the home, he would knock on the door before entering, he did not have a room in the home, he kept no personal items in the home, and he was unsure if he had keys to the home.[4] Consequently, based upon the testimony of Douglas Garland and of the Debtor, James Garland, as well as the evidence that Garland himself wrote checks to pay for the mortgage, this Court finds that Garland retained the benefits of ownership of the Residence, consisting, at least in part, of the right to live there rent-free.  *See Rosen v. Bezner,* 996 F.2d 1527, 1532 (3d Cir. 1993).

    Similarly, Garland  had an ownership interest in Commercial Litigation Group until 2002, well within the six years required on the Statement of Financial Affairs.  Even after he resigned and became "of counsel" to Commercial Litigation Group, Garland continued to be involved in that firm, continued to have check-signing authority for Commercial

---

[4]The manner in which Douglas Garland became owner of the Residence is further evidence of the fraudulent intent and schemes of the Debtor and his sons. Unbeknownst to Douglas, his brothers signed his name on a Commercial Litigation Group bank account signature card so that it would appear to the mortgage company that Douglas had access to Commercial Litigation Group funds to pay the mortgage.

-23-

Litigation Group, and continued to write and sign checks on behalf of Commercial Litigation Group for his own personal use. Thus, it appears that Garland was a person in control of Commercial Litigation Group. His son, Bill, testified that Garland had entire "sheets of checks" for the Commercial Litigation Group checking account in his possession, and the only restriction Garland had was not to write a check that was "too big." Yet, Garland did not list any previous nor current involvement as an officer, director, partner of any business entity within six years prior to his bankruptcy.

Garland also concealed his interests as a corporate officer and/or partner in Saval, Southwest, A-Don, Jagar and Commercial Litigation Group. Based upon these facts, it is clear that Garland had an ownership interest in property and as an owner or person in control of certain corporations and business entities that he failed to disclose on his bankruptcy schedules and Statement of Financial Affairs.

Having determined that he had interests that were not disclosed, the second issue for the Court is whether Garland had an interest that was transferred or concealed within one year prior to his bankruptcy filing. The Trustee and IRS argue that Garland initiated his attempts to defraud his creditors many years ago by transferring his interest in the Tahlequah residence to the Jagar Family Limited Partnership in 1988, and that he continued to orchestrate numerous subsequent transfers and concealment of that property, as well as others that he owned, well into the one year period preceding his bankruptcy.

Failure to disclose a transfer of property that occurred more than one year prior to the bankruptcy may still provide a basis to deny discharge under the doctrine of "continuing concealment." *See Rosen*, 996 F.2d at 1533 (3d Cir. 1993); *Thibodeaux v. Olivier (In re Olivier)*, 819 F.2d 550 (5th Cir. 1987); *Friedell v. Kauffmann (In re Kauffman)*, 675 F.2d 127

Case 06-08044   Doc 234   Filed 03/31/08   Entered 03/31/08 15:38:31   Desc Main
Document   Page 24 of 34

(7th Cir. 1981). The one-year requirement can be extended under the Continuing Concealment Doctrine (the "Doctrine"). The Doctrine loosens the one-year requirement by precluding a discharge when the acts constituting the debtor's fraud began before the one-year period prior to the petition date and continued into that time period. The fraudulent act can extend into the pre-petition year even if the debtor merely allowed the property to remain concealed during that critical year. *See Rosen*, 996 F.2d at 1531 (holding that a mere failure to reveal hidden assets can invoke the Doctrine, even without any other act in the pre-petition year). Evidence that a debtor transfers property but still retains a beneficial or equitable interest in the property and treats the property the same as before the transfer may establish the continuous concealment of property. *Bank of Chester County v. Cohen (In re Cohen),* 142 B.R. 720, 726 (Bankr. E.D. Pa. 1992). A debtor's concealment of the fact that he is funneling money through business entities while claiming that he has no ownership interests in those entities is also evidence of the continuous concealment of property that may result in a denial of discharge pursuant to § 727(a)(2). *Doubet v. Palermo (In re Palermo)*, 370 B.R. 599, 604 (Bankr. S.D.N.Y. 2007).

This Court has already recounted the beneficial interests Garland has in the Residence and various bank accounts, and the fact that he treats that property and the Commercial Litigation Group checking account as though he is the owner. Garland's concealment of property began before the one-year period prior to the petition date and continued into that time period. Based upon this pattern of conduct, the Court finds that the Trustee has proven the continuing concealment of property by Garland into the one year time period pre-bankruptcy. When coupled with an improper intent, continuing concealment will result in a denial of Garland's discharge.

Case 06-08044    Doc 234    Filed 03/31/08    Entered 03/31/08 15:38:31    Desc Main
Document      Page 25 of 34

The final issue regarding § 727(a)(2) is whether the debtor's transfer or concealment of property was done with fraudulent intent. Courts may infer a debtor's intent from his pattern of conduct. *Warren*, 512 F.3d at 1249. This Court has previously recognized certain "badges of fraud" from which fraudulent intent may be inferred, such as:

(1)    the lack or inadequacy of consideration;

(2)    a family, friendship, or close associate relationship between parties to a transfer or concealment of property;

(3)    the retention of possession, benefit, or use of the property in question;

(4)    the financial condition of the party sought to be charged both before and after the transaction in question;

(5)    the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and

(6)    the general chronology of the events and transactions under inquiry.

*Arvest Bank v. Green (In re Green)*, 355 B.R. 302, 310 (Bankr. E.D. Okla. 2006) citing *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582-83 (2d Cir. 1983); *see also The Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 611 (B.A.P. 10th Cir. 2001). "There is little question that if an individual transfers *title* of an item but continues to exercise dominion over it, that fraud could be inferred." *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1293 (10th Cir. 1997) (emphasis in original). Fraud may also be found where the debtor fails to disclose property or conceals a property interest. "[I]nference of fraudulent behavior flowing from a concealment is greater than from a transfer . . . ." *Id.* at 1293 n.1.

When he filed bankruptcy, Garland continued in his scheme to defraud by

Case 06-08044    Doc 234    Filed 03/31/08    Entered 03/31/08 15:38:31    Desc Main
Document    Page 26 of 34

concealing his beneficial ownership in the Residence, as well as his interests in the checking accounts and businesses. He concealed these property interests by failing to disclose them in his bankruptcy schedules. It is the Court's determination that Garland failed to disclose his interests because he wanted the Trustee to think this was a simple, no-asset bankruptcy. Garland is an experienced attorney and sought legal advice before filing bankruptcy. He certainly was savvy enough to know that he had some interest in the Residence since he lived there rent-free, and that he should have disclosed that interest. Also, the Statement of Financial Affairs form clearly specified that he was to list all businesses in which he was an officer, director, partner, or managing executive, a partner in a partnership, and other business interests within the six years immediately preceding the commencement of the bankruptcy. Yet, he disclosed nothing. This evidence indicates an intent to defraud.

The transfers of the Residence were not arm's length transactions. They have always involved family, friends, or close business associates. Since the mid-1990's, Garland has maintained that he had very little income with which to pay his debts, nor assets available to satisfy his debts. He personally has made no payments on the home, nor has he paid for the utilities. Instead, he used funds secured by Patrick Walters and monies from Commercial Litigation Group to make these payments, and to pay for expensive improvements to the property, including adding a five car garage and a swimming pool. Thus, his continued use, enjoyment, and possession of the property constitutes evidence of fraudulent intent.

Further evidence of fraudulent intent is found in the many schemes employed to keep the Residence in the Garland family. From the initial transfer to the Jagar Family

Case 06-08044    Doc 234    Filed 03/31/08    Entered 03/31/08 15:38:31    Desc Main
Document    Page 27 of 34

Limited Partnership, the mortgages by Garland's friend and accountant, the A-Don Corporation's friendly involvement and timely foreclosure, to the latest transfer to Garland's son, Douglas, the Residence's main resident never changed: Garland and his immediate family. Garland appears to have always been in control of this property. As for the latest transfer of this property, Douglas Garland admitted that he learned of his father's tax problems before he decided to purchase the Residence. Douglas reluctantly agreed to purchase the home, even though he was not looking for investment opportunities, nor could he afford to make the mortgage payments if Commercial Litigation Group did not reimburse him for them. Douglas identified at least five checks on the Commercial Litigation Group checking account that his father had signed that were written to Douglas to cover monthly mortgage payments on the home. Douglas did testify that he had no agreement with his brothers that he would refrain from asking his father and his family to move out of the home. However, whether there was an express agreement or not, it was clear from his testimony and the testimony of his brother, Bill, and his father, that Douglas purchased the Residence from A-Don for the sole purpose of preserving the Residence for Garland and his family, and, thus, keeping it away from creditors. Therefore, it is highly unlikely that Douglas or his brothers would ever give up this property and force their father and his family to move out.

After considering all the evidence, the Court determines that Garland continuously concealed his interest in the Residence, in Commercial Litigation Group, and in the various bank accounts and business entities. The Court infers from Garland's course of conduct that he intended to hinder, delay and defraud his creditors. Garland does not appear to this Court to be "an honest, but unfortunate debtor." Therefore, discharge should be denied

Case 06-08044    Doc 234    Filed 03/31/08    Entered 03/31/08 15:38:31    Desc Main
Document        Page 28 of 34

pursuant to §727(a)(2).

## 2. 11 U.S.C. § 727(a)(4)(A): Making a False Oath or Account

To deny a debtor's discharge under § 727(a)(4)(A), the movant must demonstrate by a preponderance of the evidence that the debtor (1) knowingly and fraudulently (2) made a false oath, and (3) that the oath related to a material fact. *Gullickson,* 108 F.3d at 1294. Omitting assets from the debtor's Statement of Affairs or other schedules may constitute a false oath under § 727(a)(4)(A) sufficient to deny a discharge. *Calder v. Job (In re Calder)*, 907 F.2d 953, 955 (10th Cir. 1990). However, giving a false statement based upon a mere mistake or inadvertence is insufficient to deny a discharge. *Gullickson*, 108 F.3d at 1294-95. Whether a debtor has made a false oath within the meaning of this section is a question of fact. *Crane v. Morris (In re Morris)*, 302 B.R. 728, 739 (Bankr. N.D. Okla. 2003) (footnote omitted).

As with intent under Section 727 (a)(2), it is unlikely that a debtor will admit to acting with knowing and fraudulent intent, therefore, fraudulent intent may be inferred from the facts and circumstances of the case. *First Nat'l Bk., Larned v. Davison (In re Davison)*, 2004 WL 2852352 (10th Cir. B.A.P. June 29, 2004). The false oath can be made with either fraudulent intent or proven by showing that the debtor made a false statement with fraudulent reckless indifference to its falsity. The subject matter of the oath must be material, meaning that it must be related to the debtor's business transaction, concern the discovery of assets, business dealings, or the existence or disposition of the debtor's property. *See Calder*, 907 F.2d at 955.

The Trustee argues that Garland failed to disclose: (1) his role as an officer in various business entities; (2) his signature authority for and control of various undisclosed

Case 06-08044    Doc 234    Filed 03/31/08    Entered 03/31/08 15:38:31    Desc Main
Document    Page 29 of 34

bank accounts, which he exercised to benefit himself personally, and (3) his interest in the Residence. The Trustee and IRS provided evidence of his involvement in various corporations, as well as countless examples of checks written by Garland to himself or to pay personal expenses for his family on these undisclosed checking accounts. Garland explained that these omissions were the result of a misunderstanding on his part, that he questioned his attorney before signing the bankruptcy petition, that he does not officially own any interest in the real estate in question, that he simply forgot to list his interests as an officer or director of corporations, and that he did not characterize his signatory authority on various checking accounts as an ownership interest. Garland argues that none of these omissions were of assets that would have had any value to the Trustee or his bankruptcy estate, therefore these were not material omissions.

This Court had ample opportunity to observe Garland over the course of the two day trial, and assess his demeanor and credibility while he explained the reasons for the omissions from his schedules, while admitting that he signed his bankruptcy papers under penalty of perjury. The Court is convinced that these omissions were not the result of any confusion, ignorance, mistake, or carelessness. Instead, the Court finds that the omissions were a result of a deliberate decision to withhold the information from this Court, the Bankruptcy Trustee, and Garland's creditors.

Successful administration of bankruptcy procedures depends upon the truthfulness of statements made by debtors. As an attorney who has practiced for many years, Garland is highly experienced in corporations, operating trusts for clients, and certainly is charged with knowing the penalties of perjury. As a former business owner, Garland is experienced in establishing bank accounts, writing checks, and accounting for receipts as well as

-30-

expenses. Considering these facts and circumstances, the Court does not believe that Garland was simply unaware that his ownership interests may have been of interest to the Trustee, creditors, or this Court. He had a duty to fully and accurately disclose all property interests on his statements and schedules. It is not his decision to determine the nature and value of his interest in property, or to make the determination as to the value to the estate.

Garland's false representations that he had no interest in real estate, corporations, or bank accounts led the Trustee to believe that there was no reason to inquire further to determine whether there may have been any preferential or fraudulent conveyances, or whether there were any assets available to pay creditors. *See In re Shah*, 169 B.R. 17 (Bankr. E.D.N.Y. 1994). His omissions were material, as they related to his business dealings, the discovery of assets, and the existence or disposition of his property. The Trustee and Garland's creditors should be able to rely upon the information provided in Garland's bankruptcy pleadings and schedules. The Trustee, Gerald Miller, testified that had he been given accurate information about Garland's financial affairs, he would have investigated further. Instead, Garland's financial information indicated he was a retired attorney with virtually no assets available.

Garland's testimony that he omitted his ownership interests by mistake is not believable. At the very least, these omissions by an experienced attorney establish a reckless indifference to the truth and the legal process. "[R]eckless indifference to the truth has consistently been treated as the functional equivalent of fraud for purposes of denial of discharge under § 727(a)(4)(A)." *The Cadle Co. v. King (In re King)*, 272 B.R. 282, 301 (Bankr. N.D. Okla. 2002) *quoting Boroff v. Tully (In re Tully)*, 818 F.2d 106, 112 (1st Cir.

Case 06-08044    Doc 234    Filed 03/31/08    Entered 03/31/08 15:38:31    Desc Main
Document    Page 31 of 34

1987). The Trustee has established by more than a preponderance of the evidence that Garland's omission of assets and ownership interests from his bankruptcy schedules and Statement of Affairs was a false oath made knowingly and fraudulently, and related to material facts. Garland's discharge is therefore denied pursuant to 11 § 727(a)(4)(A).

### 3. Failure to explain loss of assets under 11 U.S.C. § 727(a)(5).

Discharge may be denied under § 727(a)(5) where the debtor fails to explain satisfactorily any loss of assets or deficiency of assets to meet his liabilities. The movant's burden is, again, a preponderance of the evidence. Once it meets that burden, the burden shifts to the debtor "to explain the loss or deficiency of assets in a satisfactory manner." *Stewart*, 263 B.R. at 618. The debtor's explanation need not be comprehensive, but it does need to be supported by at least some documentation that eliminates the need for the court to speculate as to what happened to the debtor's assets. *Morris*, 302 B.R. at 742, citing *Stathopoulos v. Bostrom (In re Bostrom)*, 286 B.R. 352, 364 - 65 (Bankr. N.D. Ill. 2002). As with other provisions of the Bankruptcy Code, the purpose of this section is to provide a clear picture of the debtor's financial interest and activities prior to bankruptcy. *Morris,* 302 B.R. at 742.

The Court finds that the Trustee met his initial burden of proving that a loss or shrinkage of assets occurred. The evidence was that Garland had significant income in the years in which the original taxes were assessed and that he generated sufficient income to be able to pay his taxes. The evidence also established that Garland had access to significant assets, specifically, the undisclosed checking accounts, the Residence, funds or loans from Patrick Walters and Dr. Bundren, which he could have used to pay creditors and the IRS. Instead, Garland diverted funds to his own personal use and appears to have

Case 06-08044    Doc 234    Filed 03/31/08    Entered 03/31/08 15:38:31    Desc Main
Document      Page 32 of 34

purposely chosen not to pay his creditors.

Garland did not satisfactorily explain the loss or deficiency of assets. He testified that his class action business dried up when the IRS filed a pre-judgment garnishment in a class action case in which attorney fees should have been $30,000,000. Instead, the IRS' interference in the case caused the judge to reduce the attorney fees to $1,000,000, and other class action attorneys refused to do business with Garland. Garland did not explain to the Court, nor did he provide any documentation of his own, as to why he reported total income ranging from $15,000 to $30,000 each year from 2002 through 2005, yet the checking accounts to which he had access reflected payments to him during those same years ranging from approximately $27,000 to $71,000. Garland testified that accountants tediously went through those checking account records and counted all of those payments to Garland as income. However, he failed to reconcile the discrepancy between his tax returns and the checking account payments to him. Thus, the Court is left to speculate about how Garland lost his considerable income and assets, and conclude that he actually had access to significant assets but chose to conceal those assets in order to appear destitute to his creditors. Further, the Court must presume that Garland's lack of explanation or objection to the IRS' summary of his personal expenses that were paid out of the concealed checking accounts, often with checks written and signed by Garland, was for the purpose of obscuring the true nature of his financial affairs. Therefore, the Court finds that Garland's discharge should be denied under 11 U.S.C. § 727(a)(5) due to his failure to satisfactorily explain the loss or deficiency of assets to meet his liabilities.

**B.    Nondischargeability of taxes under 11 U.S.C. § 523(a)(1)(C).**

Because this Court has determined that Garland's discharge should be denied,

Case 06-08044    Doc 234    Filed 03/31/08    Entered 03/31/08 15:38:31    Desc Main
Document    Page 33 of 34

Garland's and the United States' request for an order determining dischargeability under this section is moot.

## <u>CONCLUSION</u>

James Clinton Garland has willfully attempted to transfer and conceal property within one year before and after filing bankruptcy, has made a false oath on his bankruptcy schedules, and has failed to explain the loss or deficiency of assets, therefore, this Court finds and determines that his discharge should be denied pursuant to 11 U.S.C. § 727(a)(2), (a)(4)(A), and (a)(5).

IT IS THEREFORE ORDERED that Debtor James Clinton Garland's discharge is hereby **denied**.

###